{¶ 127} I respectfully dissent on three issues.
 {¶ 128} First, I believe the record provides sufficient signals to require defendant be given a psychiatric examination.
 {¶ 129} On the one hand, I understand that most of defendant's answers to the questions the court asked suggested nothing aberrant. On the other hand, many of those questions were direct questions about defendant's understanding of trial procedure and rights — traditional questions that satisfy Crim. R. 11 but that were not likely to reveal the particular disorder his trial counsel described: "a mental condition that causes him to be inappropriately compliant with authority figures and give answers and responses that he believes they want to hear." Motion to Suppress at 1-2.
 {¶ 130} But the court had an opportunity to observe elsewhere some instances of this irrational compliance. For example, defendant explained that he falsely confessed to the police in order to "be in concurrence with them as totally as possible." Tr. 487. Later he explained that he signed a statement that was not true because he wanted "them to believe me. I wanted to speed up the process* * * as quickly as possible so I can take it to trial." Tr. 489. Contradicting this desire to speed up the process is his explanation that "[t]ime and death mean nothing to me." Motion to Suppress at 2.
 {¶ 131} Defense counsel explained to the court:
 {¶ 132} "I don't think he really understands what's going on here. He's trying to please you as he did last time when we were out here on the record on my motion to refer him for a psychiatric examination * * *.
 {¶ 133} "Again this morning the same thing happened. He ordered me to withdraw this motion, that he wanted it in evidence and to please you and in five minutes he completely changes his mind." Tr. 32, emphasis added.
 {¶ 134} In his motion to suppress, defense counsel explained further the flaw in his thinking: "[Defendant] indicates that his written statement contained the facts that the interviewing officers wanted to hear, not the truth but further says that he agreed to those facts because the police lied to him so he lied to them. However, he has nounderstanding whatever that those statements are inculpatory and damagingto his defense." Emphasis added.
 {¶ 135} Defendant's discussion of his confession and his acts demonstrate that lack of understanding:
 {¶ 136} "I would say it was a fight between Good and Evil. And to keep her from doing any future harm to herself that being the most important thing.
 {¶ 137} "* * *
 {¶ 138} "Because there were forces working against her. What I mean by that is the forces of evil. I'm just glad that she is alright now. I'm also glad that she did these things with me and no-one else because they would of been bruttal [sic] with her.
 {¶ 139} "* * *
 {¶ 140} "I knew it was wrong and right at the same time. Right because she was with me and no-one [sic] else. Wrong because of what I'm going through now.
 {¶ 141} "* * *
 {¶ 142} "I believe that I have done the will of God and we can close with that." State's Trial Exhibit 3.
 {¶ 143} A compulsion to please can easily disguise a mental disorder. The court did not ask many questions, however, that would have tested such an inordinate compliance. One must look, therefore, for inconsistencies and contradictions that might reveal his condition. The record here provides such contradictions.
 {¶ 144} One sign of his flawed thought process is shown in his discussion of the ennobling sacrifice he attributed to the ordeal of imprisonment. During cross-examination, he testified that he falsely confessed in order to go through the ordeal and sacrifice of being attacked by the prisoners at the East Cleveland jail:
 {¶ 145} "Q. Let's start with the first one. You claim that you are being brutally attacked?
 {¶ 146} A. Yes, I was attacked.
 {¶ 147} Would it be fair to say people were attacking you because they thought that you were child molester:
 {¶ 148} Yes, they did.
 {¶ 149} Why would you admit to being one?
 {¶ 150} Because I wanted to go through that ordeal. I wanted to gothrough that sacrifice.
 {¶ 151} Was it enjoyable?
 {¶ 152} It was an ordeal.
 {¶ 153} Why would anyone voluntarily take on an ordeal like that?
 {¶ 154} To prove what kind of character that I have.
 {¶ 155} By admitting that you rape an 11 year old, you prove good character?
 {¶ 156} No. By admitting that I did not never threaten a child. Iwould put my life in harms way 100 percent."
 {¶ 157} Tr. 504-5, emphasis added. The contradiction inherent in this explanation illustrates defense counsel's observation of a "significant" and "very apparent * * * thought disorder." Tr. 10.
 {¶ 158} Indeed, there was enough of a concern about his mental state that he was put in a suicide-watch area. Noteworthy is the language defendant used to describe his release from this area. He said "the psychologist or psychiatrist cleared me and gave me a receipt * * *." When the court asked him what the receipt said, he answered: "A referral that I can be reupgraded back to population." Tr. 49, emphasis added. It sounds as if he bought an airplane ticket. Such incongruous language calls into question his understanding of what is happening.
 {¶ 159} There are, moreover, other symptoms of a mental health problem. His counsel reported that defendant "is prone to giving very short, repeated, almost rhythmic answers, saying the same statement over and over again * * *. Tr. 10. His sister had the same difficulty in communicating with him: that is, he also gave her the same repetitive answer without discussion. Moreover, the trial court was advised that defendant's mother had a history of psychiatric problems.[9] Tr. 11-12. Finally, there was the unique offer by defense counsel to pay himself for the psychiatric exam, which the court had denied when it was requested at state expense.
 {¶ 160} There was sufficient evidence to require the court to question whether defendant was capable of assisting in his own defense and thus to compel a psychiatric evaluation. From the entire record, I must conclude that the standard in State v. Were (2002), 94 Ohio St.3d 173,2002-Ohio-481, 761 N.E.2d 591 was met. That is, there were "sufficient indicia of incompetency to call into doubt defendant's competency to stand trial." As appellate counsel correctly explained: "When determining competency, a trial court must ascertain whether a defendant: `has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him.' Dusky v.United States (1960), 362 U.S. 402 (per curiam) (emphasis added)." Appellant's Reply Brief p. 6. That understanding is not demonstrated here.
 {¶ 161} I must also take issue with the majority's decision that a conviction of forcible rape was not against the manifest weight of the evidence. First, defendant apparently sees his relationship with the victim as a good one. As he said, the relationship was "right because she was with me and [no] one else." In his confession, he describes it as "never about sex[;] it was about love."
 {¶ 162} Second, there was no evidence that he used force. The majority notes that he allegedly warned that he would kill her if she ever told anyone. A threat about telling, however, is not the same as threatening force for rape itself. Moreover, such language in our culture has become, unfortunately, a common hyperbole, not to be taken literally if the context does not support such an interpretation, and the context does not. In fact, defendant made this statement in the library, a presumably safe location.
 {¶ 163} The majority also observes that defendant is large and the 11-year-old child presumably small and that force may be implied by a man of such size on top of her. There is not one whit of evidence, however, that defendant ever, in any way, used or threatened physical force to rape her. On the contrary, if she told him to stop, he did. Tr. 346. If she experienced discomfort, she would not allow him to continue. Tr. 353. He always stopped when she objected. Tr. 371. When he asked for permission — and he did — when she refused, nothing more happened. Tr. 344.
 {¶ 164} Most significantly, the letter the girl wrote to defendant clarifies their relationship was not based on force, threatened or actual. In this letter the girl offered to engage in intercourse with him if he gave her money to buy a mother's day gift. Her sister also stated that he offered her money for sex.
 {¶ 165} Finally, I must disagree on Assignment of Error IX. The court could not correct by journal entry its failure to advise of post-release control when the court never mentioned this advisement at the oral sentencing. State v. Morrisey (Dec. 18, 2000), Cuyahoga App. No. 77179. Moreover, since the state did not appeal this question, the only solution is to remand the matter to correct the journal entry so that it reflects accurately what occurred at sentencing. State v. Fitch, Cuyahoga App. No 79937, 2002 Ohio 4891, cert. allowed 2003 Ohio 1189. See also,State v. Finger, Cuyahoga App. No. 80691, 2003 Ohio 402.
[9] Just after the court was advised of the mental history of defendant's mother, the court said, "I need some indication. It's like if your father had a heart attack, you're more likely to have a heart attack type of thing." Tr. 40-41. It is not clear from this statement what more the court needed about the family history of any mental health problem.